# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:04CV421-H

| | |
|---|---|
| SANDRA M. CAPOUCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM AND ORDER** |
| ) | |
| COOK GROUP, INCORPORATED, ) | |
| VANCE PRODUCTS, INC., d/b/a ) | |
| COOK UROLOGICAL, INC., and ) | |
| COOK MEDICAL, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the Court on the "Defendants' Motion for Summary Judgment" (document #42) and "Brief in Support . . . [with attached exhibits]" (document #43), both filed March 31, 2006; and the pro se Plaintiff's ". . . Response . . . [with attached exhibits]" (document #45) filed May 1, 2006.[1] On May 12, 2006, the Defendants filed their "Reply . . ." (document #46), and on May 30, 2005, the Plaintiff filed her ". . . Supplemental Information to Response of Summary Judgment" (document #48).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this motion is now ripe for determination.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will grant the Defendants' Motion for Summary Judgment, as discussed below.

---

[1]On April 3, 2006, the Court issued a "Order and Notice to Pro Se Plaintiff of Defendant's Motion for Summary Judgment," advising the Plaintiff of her burden and responsibility in responding to the Defendant's motion and setting the time for filing a response to April 28, 2006. See document #44.

# I. FACTUAL AND PROCEDURAL BACKGROUND

This action seeks damages and equitable relief for sexual harassment, constructive discharge, and retaliation in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e ("Title VII") and state public policy, and a state law claim for intentional infliction of emotional distress.

### A. Factual Background[2]

The Defendants are in the business of creating and selling medical products to health care providers.[3] The Plaintiff began working for the Defendants on January 4, 1999, as a Regional Manager, which meant that she was responsible for making sales calls in a particular region. Her immediate supervisor was Mr. Bobby Bateman. The Plaintiff alleges that she was sexually harassed by six of the Defendants' employees. As a result, beginning in 2001, she suffered from anxiety, stress, and trouble sleeping, for which she sought medical and psychiatric help.

Before proceeding to the specific allegations against each of the six employees, the undersigned notes that much of the Plaintiff's deposition testimony conflicts with the facts as she has presented them in her Response to the Defendant's motion. Although the Plaintiff was represented by counsel at the time of her deposition, she defends these discrepancies by stating that she "did not prepare for the deposition." And, she "had spent the previous time since April of 2004

---

[2]Although the undersigned has considered all of the information presented by the Plaintiff, only the alleged facts relevant to her claims in this lawsuit have been included in this section. For example, the Plaintiff provided the Court with an article on Enron to show that managers of large companies, like the Defendants, think of themselves as "above the law." Such "facts" have no relevance to claims under Title VII or the Plaintiff's intentional infliction of emotional distress claim.

[3]The Defendants assert in a footnote that "Cook Group Incorporated is a holding company and never employed plaintiff, so there is no basis for holding it liable for plaintiff's claims." Although the Defendants do provide some additional information in their Reply to the Plaintiff's Opposition, there is not enough information before the Court to make this determination. However, considering that this Order dismisses all claims against the Defendants on other grounds, this argument need not be addressed.

trying to forget and heal from the trauma at Cook." She also felt that it was impossible for her to remember "everything the split second the question is asked." And, she states that the Defendants' "excellent attorney" manipulated the questions and her answers.

It is well settled law that the Plaintiff cannot attempt to create an issue of fact to survive summary judgment by contradicting her prior deposition testimony. See, e.g., Rohrbough v. Wyeth Laboratories, Inc., 916 F.2d 970, 974-75 (4th Cir. 1990) (affirming district court's conclusion that affidavit which conflicted with earlier deposition testimony should be disregarded as a "sham issue of fact"). Thus, the Plaintiff's statements of fact which conflict with her prior statements of fact in her deposition would be properly stricken from this Court's consideration. However, the undersigned has found that even when considering all of the alleged facts presented by the Plaintiff in her deposition, Response, and Surreply, her claims do not survive summary judgment. Accordingly, the following recitation of the facts is taken in the light most favorable to the Plaintiff, even in giving the Plaintiff total liberty to supplement and contradict her deposition testimony.

### 1. Rodney Bosley

Among the allegations of sexual harassment, Rodney Bosley, a Product Manager, attempted to physically grab the Plaintiff in an "inappropriate manner." In September of 1999, Mr. Bosley also commented that he wanted to stick his tongue down the Plaintiff's throat, and then moved toward the Plaintiff while sticking out his tongue. In 2002 or 2003, at the May or Fall meeting, Mr. Bosley chased the Plaintiff and tried to grab her as she ran from him and "stated 'no.'"

### 2. Chuck Franz

Chuck Franz, the President of Cook Urological, Inc., made a special trip to Charlotte in June

<mark>3</mark>

2001 just to follow the Plaintiff to lunch and then again later that day.[4]  Later, during a plant meeting, Mr. Franz told the Plaintiff, in what she perceived as a threatening manner, that he might be making a trip to Charlotte.  Mr. Franz also asked the Plaintiff "very personal questions" at sales meeting dinners.

### 3. Tom Worthington

In May 1999, Tom Worthington, a Sales Representative, criticized her during a plant visit for a training update.  He told her in a harsh manner that she was not qualified for a position in sales because she is not outgoing enough.  She felt this was sex-based because she did not think he would have said the same thing to a male.

### 4. Ken Nicholson

In early 2003, at an annual sales meeting, Ken Nicholson, a National Sales Manager, yelled the Plaintiff's name in a crowd of people in what she perceived as a "derogatory way."  The Plaintiff did once report a problem to Mr. Nicholson in October or November of 2002, but "he completely ignored [her] complaint."

### 5. Bobby Bateman

As the Plaintiff's supervisor, Mr. Bateman was in frequent contact with her, and was required to train sales representatives and ride along with them to observe their performance from time to time.  Mr. Bateman once "got in trouble" for spending too much on dinners with the Plaintiff while training in Miami in January or February of 1999.  On this same trip he sent a fruit basket to her room addressed to Mrs. Bobby Bateman – the Plaintiff "thought it was a mistake and ignored the

---

[4]The Plaintiff later states that this occurred either in the Summer of 2001 or 2002.

name." In 2000 or 2001, he hugged and stared at the Plaintiff inappropriately and also asked her "very personal questions," such as whether she was seeing anyone and what her hobbies were. Also in 2001, Mr. Bateman stated that "he wouldn't care if his girlfriend found someone else." In that same year, Mr. Bateman set up a time to work with the Plaintiff and while working with her he asked her some personal questions. Sometime in 2001, Mr. Bateman called the Plaintiff two or three times to see if they could meet to work in Charlotte, which made the Plaintiff uncomfortable.

On another occasion, in late January 2002, Mr. Bateman, after a work dinner where he drank excessively, touched the Plaintiff inappropriately and then asked her to go up to his hotel room. He then told the Plaintiff that if she "was more friendly, then she would have gotten a raise during [that] year." In January 2002, the Plaintiff did not receive a raise, although she did receive one in 2003. After rejecting Mr. Bateman, he retaliated against her by

> not providing what plaintiff needed to do her job, such as ignoring her calls, providing plaintiff with wrong information about products, not including plaintiff in national meetings, assigning a trip that plaintiff won through selling products and giving same to someone else and then denying that he did this, and making comments to plaintiff that were rude, such as plaintiff should not be in sales, questioning her RN license, and asking plaintiff for plaintiff's social security number.

In May 2002, another Representative told a dirty joke, Mr. Bateman stared at her, and another unknown male grabbed her from behind inappropriately.[5]

Among the alleged retaliation, in September 2002, the Plaintiff states that a reward trip for sales was given to another associate over her when she had earned the trip. Specifically, the Plaintiff takes issue with the fact that the email she sent to Mr. Bateman to complain about this was forwarded

---

[5] The Plaintiff later states that the male co-worker grabbed her from behind inappropriately sometime in December of 2002 or 2003.

to Ken Nicholson, a National Sales Manager. The Plaintiff perceived the forwarding of this email as a threat.

Sometime in the Fall of 2003, the Plaintiff overheard Mr. Bateman say that he wished she would quit. Also in 2003, Mr. Bateman told the Plaintiff that she should not have her RN license listed on her business card because she was not attending continuing education courses. A few days after this meeting he contacted her to let her know that Carol Tow in human resources needed her social security number, and the Plaintiff considered this invasive, especially because she had already given the Defendants her social security number.

In addition, although the Plaintiff first alleges that Mr. Bateman was "fabricating" his report that she refused to work with him, she then states that at least during one of his requests to work with her she had taken vacation time due to her medical problems.

Sometime in 2002 or 2003, Mr. Bateman excluded the Plaintiff from a national meeting. In the Summer of 2003, Mr. Bateman excluded the Plaintiff from a meeting with a specialist from Australia who would have helped her sell a specific product. In January of 2004, Mr. Bateman ignored the Plaintiff's voicemail messages. And, in February of 2004, Mr. Bateman wanted to come and work with the Plaintiff, but she could not because she was taking some time off for her health. She asked Mr. Bateman to come a few weeks later and he refused and never showed any concern for the Plaintiff's health.

The Plaintiff alleges, with no specificity, and in contradiction to her deposition testimony, that in March 2004, Mr. Bateman made "very abusive, harassing, sex-related comments and threats." These allegations stem from an incident where Mr. Bateman called the Plaintiff to set up a time to

work with her. After he was already on his way to Charlotte she called him to cancel due to illness. Mr. Bateman finished his drive to Charlotte and expressed his anger at the Plaintiff for canceling their meeting. The Plaintiff felt this was "sex-based harassment and a potential for sexual assault and considered getting a restraining order for Bateman."

In a 2003 Fall meeting, someone looked at the Plaintiff and appeared to be talking about her and laughing.

In early 2004, the Plaintiff missed the national annual sales meeting due to more health concerns, but failed to reach anyone but the travel agent to alert them to her change in plans.

### 6. Kathie Osborn

Also at an annual sales meeting in 2003, Kathie Osborn, also a Regional Manager like the Plaintiff, made inappropriate physical contact with the Plaintiff and later, around March or April of 2003, retaliated against the Plaintiff by "harassing plaintiff about sales clients when she wasn't the supervisor of plaintiff and also sending her Urology representative to make a sales call to plaintiff's Ob/Gyn account." However, the Plaintiff did not perceive this behavior as harassing until 2005 when she allegedly learned new information about Ms. Osborn's sexual orientation.

### 7. The Plaintiff's Resignation

On April 8, 2004, the Plaintiff resigned her position with the Defendants, stating that she was constructively discharged.

The Plaintiff did not report her concerns about sexual harassment until after she resigned her position. Her reasoning was that she felt her boss would be believed over her and that Tammy Lawrence of Human Resources had a conflict of interest because the same people who were

7

harassing the Plaintiff were Ms. Lawrence's bosses and Ms. Lawrence would have been loyal to them because they hired her. In addition, Ms. Lawrence worked in another state and communication would have been too difficult for the Plaintiff.

B. **Procedural Background**

On April 16, 2004, the Plaintiff filed an administrative Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

On August 25, 2004, the Plaintiff filed a timely Complaint in this Court, and an Amended Complaint on December 21, 2004 and another on February 3, 2006, alleging claims for sexual harassment and constructive discharge in violation of Title VII and state public policy, and a state law claim for intentional infliction of emotional distress. In addition, the Plaintiff is now pursuing a claim for retaliation under Title VII.

On March 31, 2006, the Defendants filed their Motion for Summary Judgment, which has been fully briefed as set forth above and is, therefore, ripe for determination.

## II. DISCUSSION OF CLAIMS

A. **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

8

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848, 850 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083, 1089 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

Regarding the Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in Title VII cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." N.C. Dept. of Correction v. Gibson, 308 N.C. 131, 136, 301 S. E. 2d 78, 82 (1983). Accord Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995); and Phillips v. J.P. Stevens & Co., Inc., 827 F. Supp. 349, 353 (M.D.N.C. 1993) ("The public policy of North Carolina expressed in N.C.G.S. § 143-422.1 et seq. is essentially identical to the public policy articulated in Title VII").

Accordingly, the undersigned will apply the elements and paradigm of proof established for Title VII claims to determine the Plaintiff's state public policy claims.[6]

---

[6] Thus, for practical purposes, the Plaintiff's state law wrongful discharge claim is being treated as part of the Plaintiff's Title VII claims.

## B. Gender-Based Discrimination

Title VII makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1). Further, Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

To establish sexual harassment based on a hostile or abusive work environment, a plaintiff is required to prove that the offending conduct: "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (citations omitted).

Elaborating on the second element of a claim for a sexually hostile work environment, the critical inquiry is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id., quoting Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998). A trier of fact may find discrimination where "a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Oncale, 523 U.S. at 80.

Concerning the third element of a hostile work environment claim – proof of conduct

sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment – a court must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "This standard is designed to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Ocheltree, 335 F.3d at 333, quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations omitted). See also Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 773 (4th Cir. 1997) ("There is no allegation that Hartsell was inappropriately touched, propositioned, flirted with, taunted, or even ogled."); Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996) (listing cases involving infrequent, isolated incidents in which court had held that harassment was not severe or pervasive as a matter of law). However, this standard does protect "working women from the kind of male attentions that can make the workplace hellish for women." Ocheltree, 335 F.3d at 333 (citations omitted). Finally, as to the fourth element, where an employee is harassed by a coworker, "the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it," and where the employee is harassed by a supervisor, "an employer may be found vicariously liable." Id. at 333-34.

Applying these legal principles to the facts of this case, and taking the evidence in the light most favorable to the Plaintiff, she has failed to establish a Title VII claim for a hostile work environment based on sex. Looking to the first step in the analysis, the Plaintiff has asserted that

the conduct was unwelcome and the undersigned has no reason to doubt this. Accordingly, the Plaintiff has succeeded in establishing the first element of her sexual harassment claim.

As to the second element, that the conduct was based on the Plaintiff's sex, she has only proven this as to some of the conduct. The only conduct, out of all that was alleged by the Plaintiff, that is based on her sex is: (1) Mr. Bosley's attempt to inappropriately grab the Plaintiff, his comment that he wanted to stick his tongue down the Plaintiff's throat in 1999, and his chasing her in 2002 or 2003; (2) the work dinner in January 2002 where Mr. Bateman touched the Plaintiff and tried to get her to come up to his hotel room; and (3) the unknown male who grabbed her from behind. Importantly, it was not sex-based harassment for Mr. Bateman to be angry with the Plaintiff after he drove to Charlotte to work with her and she cancelled. Similarly, Ms. Osborn's 2003 conduct, which did not offend the Plaintiff until 2005 when she learned Ms. Osborn's sexual orientation, is not sex-based harassment. Also noteworthy is the fact that the Plaintiff stated in her deposition that she experienced no sexual harassment after January of 2002.

In any event, the Plaintiff has clearly failed to establish the third element of a hostile work environment, that is, the evidence taken in the light most favorable to the Plaintiff does <u>not</u> show under prevailing Fourth Circuit authority that the conduct was so severe or pervasive as to create an abusive work environment in violation of Title VII. First, although the undersigned does not condone any of the comments or conduct, it is clear from the record and allegations that the comments were relatively infrequent. The Plaintiff worked for the Defendant for just over five years, most of which time was spent working alone and making sales calls. Even if the offensive conduct did occur after January of 2002, her description of the incidents does not create a picture of frequent

harassment. Nor does the severity of the conduct, although inappropriate, reach the level of actionable conduct in the Fourth Circuit. Accord Dwyer v. Smith, 867 F.2d 184, 187-88 (4th Cir. 1989) (affirming directed verdict in Title VII case even where evidence showed that female police officer was subjected to pornographic material placed in her station mailbox and to other officers' sexually explicit conversations); Hartsell, 123 F.3d at 773-74 (finding the following conduct not sufficiently severe or pervasive: comment that every female in the office had cried like a baby, inappropriate comment upon seeing a buxom woman in company magazine, asking a woman whether she would be a "mini van driving mommy" or "be a salesperson and play with the big boys," statement that a woman should go home and fetch her husband's slippers "like a good little wife," among other comments and conduct not considered gender-specific).

Next, there are no allegations of physically threatening incidents. The conduct discussed above which was based on her gender amounts to "offensive utterances," which under the totality of the circumstances in this case, simply do not rise to the level of actionable wrongdoing. And, finally, there is no evidence that any or even all of the conduct interfered with the Plaintiff's work performance. To the contrary, the Plaintiff actually received a raise in 2003, and was never fired in spite of the fact that she missed national meetings and continuously avoided the requirement that her immediate supervisor ride with her to evaluate her. Based on these facts, it would be unfounded to conclude that the gender-based conduct was sufficient to create a "hellish" workplace for the Plaintiff. See Ocheltree, 335 F.3d at 333, quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

Having concluded that the Plaintiff failed to establish that gender-based behavior created an

abusive work environment, it is unnecessary to consider the final element of the claim, that is, whether there was a basis for imputing the alleged hostile work environment to the Defendant. In short, the evidence taken in the light most favorable to the Plaintiff fails to show behavior which was sufficiently egregious to create an abusive work environment. The Court is compelled to grant the Defendants' Motion for Summary Judgment as to the Plaintiff's Title VII hostile work environment claim.[7]

### C. Constructive Discharge

A plaintiff alleging constructive discharge under Title VII "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004). Once this standard is met, the employer may defend against such a claim by showing "both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." Id. at 134. However, this defense is only available where there was no "employer-sanctioned adverse action officially changing [the employee's] employment status or situation," such as a demotion. Id.

---

[7]The Defendants initially argued that all but a few of the Plaintiff's allegations were time barred by the requirement that a plaintiff file her charge of discrimination with the EEOC within 180 days of the alleged discriminatory activity. In addition, the Defendants argued the affirmative defense that they exercised reasonable care to prevent and promptly correct harassing behavior, and that the Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by the Defendants.

Because the undersigned found that the Plaintiff has not satisfied the elements of a hostile work environment claim, the merits of the above arguments have not been addressed. This is not to say that the above arguments were without merit, but in light of the lenient standard afforded a pro se plaintiff, the undersigned was compelled to look at her claim substantively. Once it was determined that the Plaintiff's claims could not withstand a substantive review, addressing the Defendant's other arguments was unnecessary.

However, the Plaintiff's ability to prove her hostile work environment claim "is a necessary predicate to a hostile-environment constructive discharge case." Suders, 542 U.S. at 149. As discussed above, the Plaintiff has not asserted facts, even taken in the light most favorable to her, to prove a hostile work environment claim. Thus, she cannot carry her burden to prove constructive discharge either. See Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (affirming finding of no constructive discharge where the plaintiff's supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and required her to work with an injured back); James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 378 (4th Cir. 2004) (finding supervisor's critical comments about the plaintiff in a partners' meeting that discussed promotions and a suggestion that the plaintiff start looking for a new job not constructive discharge); and Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 273 (4th Cir. 2001) (quoting Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994), for the proposition that "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign").

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's constructive discharge claim will also be granted.

**D. Retaliation**

In addition to prohibiting harassment or discrimination in the workplace on the basis of race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating

against employees who attempt to enforce rights under the Act. 42 U.S.C. § 2000e-3(a).[8] To establish a prima facie case of retaliation in violation of Title VII or the ADEA, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the adverse action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (applying same standard to retaliation claim under Title VII and ADEA). See also Hopkins, 77 F.3d at 754; and Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296.

---

[8] Title 42 U.S.C. §2000e-3(a) specifically provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence... Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).

The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." Childress v. City of Richmond, 907 F. Supp. 934, 940 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998) (*en banc*), cert. denied, 118 S.Ct. 2322 (1998). Accord Mayo v. Kiwest Corp., 898 F. Supp. 335, 337 (E.D.Va. 1995).

For argument's sake, the undersigned will assume that the Plaintiff engaged in "protected activity" prior to her termination, that is, she opposed the discriminatory practices, or sexual advances of Mr. Bosley and Mr. Bateman. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or . . . opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same).

However, much less tenable is the Plaintiff's contention that she suffered an adverse employment action. She cites no retaliation by Mr. Bosley. As for Mr. Bateman, she states that he

17

engaged in conduct such as:

> not providing what plaintiff needed to do her job, such as ignoring her calls, providing plaintiff with wrong information about products, not including plaintiff in national meetings, assigning a trip that plaintiff won through selling products and giving same to someone else and then denying that he did this, and making comments to plaintiff that were rude, such as plaintiff should not be in sales, questioning her RN license, and asking plaintiff for plaintiff's social security number.

While this conduct may have upset the Plaintiff, it did not impact her job performance.

While the Plaintiff makes general allegations that she might have been able to perform her job better had she been able to work with a particular specialist or had she received information from Mr. Bateman faster, none of this amounted to an actual adverse employment action. Further, as discussed above, the evidence does not support a finding of constructive discharge either. Even the most disturbing allegation in all of the facts presented by the Plaintiff, that Mr. Bateman told her that she might have gotten a raise in 2002 if she were more friendly after she refused to go with him to his hotel room, loses its impact in light of the fact that she did receive a raise in 2003. The failure to receive a raise in 2002 is the only fact which even intimates an adverse employment action and when considered among the totality of circumstances in this case it does not create an actionable claim for retaliation under Title VII.

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim must and will be <u>granted</u>.

### E. Intentional Infliction of Emotional Distress

In North Carolina, to state a claim for intentional infliction of emotional distress a plaintiff must show: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress of another. <u>See</u> <u>Thomas v. Northern Telecom, Inc.</u>, 157 F. Supp. 2d 627,

634-35 (M.D.N.C. 2000); Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981); and Simmons v. Chemol Corp., 137 N.C. Ct. App. 319, 325, 528 S.E.2d 368, 371 (2000).

North Carolina law establishes a stringent standard that permits liability to be imposed only where the conduct at issue is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hogan v. Forsyth Country Club, 79 N.C. App. 483, 493-94, 340 S.E.2d 116, 123 (1986). Whether the conduct alleged meets this stringent standard is a question of law for the court, not a question of fact for the jury. Id. 79 N.C. App. at 490, 340 S.E.2d at 121. Accord Wagoner v. Elkin City Schools' Bd. of Educ., 113 N.C. App. 579, 586, 440 S.E.2d 119, 123; Johnson v. Bollinger, 86 N.C. App. 1, 11, 356 S.E.2d 378, 381 (1987); and Briggs v. Rosenthal, 73 N.C. App. 672, 676, 327 S.E.2d 308, 311(1985). Furthermore, "in employment actions, North Carolina courts have been reluctant to find intentional infliction of emotional distress claims actionable." Frazier v. First Union Nat. Bank, 747 F. Supp. 1540, 1553 (W.D.N.C. 1990).

When a plaintiff raises both hostile work environment and intentional infliction of emotional distress claims, the plaintiff must meet the burden on the hostile work environment claim of showing severe or pervasive conduct to prevail on the intentional infliction of emotional distress claim. See Hartsell, 123 F.3d at 774 (summary judgment for employer proper on hostile work environment and intentional infliction of emotional distress claims where plaintiff failed to allege conduct sufficiently egregious to create an abusive or hostile environment). Because the Plaintiff has failed to establish her federal claim for a hostile work environment, the state law claim must also be dismissed.

Furthermore, in cases where North Carolina courts have found intentional infliction of

19

emotional distress, the conduct has been extremely egregious, far beyond the factual allegations in this case.  For example, in Hogan, the single successful plaintiff alleged that in addition to using profanity and threatening her, defendant's agent made sexually suggestive remarks, coaxed her to have sex with him, subjected her to non-consensual sexual touching, threatened her with bodily injury, and ultimately threatened her with a knife.  79 N.C. App. at 490, 340 S.E.2d at 121.  Nothing remotely analogous to this kind of extreme conduct occurred in this case.

Applying these legal principles to the allegations in this case, the Plaintiff has clearly failed to state a claim for intentional infliction of emotional distress.

### III.  ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1.  The "Defendants' Motion for Summary Judgment" (document #42) is **GRANTED**; and the Complaint is hereby **DISMISSED WITH PREJUDICE**.

2.  The Clerk is directed to send copies of this Memorandum and Order to counsel for the Defendant;  and to the pro se Plaintiff, that is, Sandra M. Capouch, 330 Franklin Road, #135A-239, Brentwood, Tennessee  37027.

**SO ORDERED, ADJUDGED, AND DECREED.**
                                        Signed: June 5, 2006

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge